# EXHIBIT A

# Part 4

177645.txt

```
 1          Did anyone at Advance, including
 2   yourself or anyone else, have conversations with
 3   Forum about the design specifications that are
 4   Exhibit 22?
 5      A    I don't know.
 6      Q    Okay.  Do you know what steps, if any,
 7   Forum took to ensure that Advance followed the
 8   design specifications that are identified as
 9   Plaintiff's Exhibit 22?
10                   MR. BROOKS:  Objection.
11                   THE WITNESS:  I don't know what
12   Forum did.
13   BY MR. NEAL:
14      Q    While you are sitting here as the
15   corporate designee, and I understand most of your
16   testimony is based on the records you have
17   reviewed, have you seen any records which would
18   indicate that Forum took steps to ensure that
19   Advance followed the design specifications that are
20   identified in Plaintiff's Exhibit 22?
21                   MR. BROOKS:  Objection,
22   foundation.
```

⬜                                                                166

```
 1                   THE WITNESS:  I have seen no
 2   documents indicating that Forum took steps to
 3   guarantee that the Advance product met all of the
 4   requirements of Exhibit 22.
 5   BY MR. NEAL:
 6      Q    Okay.  Let me quote -- in this case, you
```
                              Page 126

177645.txt
7   verified some interrogatory responses, probably --

8   no, just the one set, I think.

9          Anyway, you -- Advance made a response

10  as to Forum's set of interrogatories, and with

11  respect to the first one, you state:  Advance avers

12  that it was never contacted by anyone at any time

13  to discuss the design of the light fixtures which

14  are the subject matter of this lawsuit.

15      A    Sorry?

16                  MR. NEAL:  You can just read it

17  back, please.

18      (The reporter read the record as requested.)

19  BY MR. NEAL:

20      Q    Do you stand by that answer, sir?

21                  MR. ZOFFER:  Objection to form.

22                  THE WITNESS:  Based on the

167

1   investigation I did, there's every indication that

2   that is a true statement.

3   BY MR. NEAL:

4       Q    Based upon your review of the records

5   and your understanding?

6       A    Review of the records and discussion

7   with people that would've been --

8       Q    That's a different question.  Your

9   answer stands.  I'm going on.

10          Based upon your review of the records,

11  Advance's records, and your understanding of the

12  case, did anyone at Advance speak to anyone at

13  Amtrak regarding Exhibit 22, the design

14  specifications?

Page 127

177645.txt

15      A    Our sales representative, Al Lassoff,
16   was in contact with Forum.  Al Lassoff has
17   indicated that he did not -- he's not a consultant
18   in the design of luminaires, but was he aware that
19   there was -- was this document discussed or were
20   the specifications in this document discussed with
21   him?  That I don't know.  I know that he was not --
22   he's not a consultant in luminaire manufacturing or

168

1    design.
2        Q    Let me ask a different -- since you have
3    given that answer, let me ask a different question.
4             Do you contend -- well, strike that.
5             Is it your understanding that Advance
6    was obligated to follow Plaintiff's Exhibit 22 in
7    the manufacture of the ballasts?
8                      MR. ZOFFER:  Objection to form.
9                      THE WITNESS:  I have no
10   indication that Advance even knew that -- the
11   detailed requirements of Exhibit 22.  And Advance,
12   from all the evidence I have been able to gather,
13   made no representation that our product met the
14   requirements of Exhibit 22.
15   BY MR. NEAL:
16       Q    Okay.  Thank you.
17            Let me turn to Amtrak for a second.  And
18   I think the answer is no, based upon the
19   interrogatory responses, but did Advance
20   communicate with Amtrak regarding the ballasts at
21   all?

Page 128

177645.txt
22              MR. BROOKS:  At any point in

169

1   time?
2                   MR. NEAL:  At any point in time.
3   Then I will narrow it.
4                   THE WITNESS:  I don't know who
5   you mean by "Amtrak."
6                   MR. NEAL:  Okay.
7                   THE WITNESS:  There is an
8   indication that we were contacted by -- where was
9   it?
10  BY MR. NEAL:
11      Q    Mr. Ekinrode (ph), Gary Eckinrode?
12      A    Yeah, wherever it -- okay.  Dennis
13  Henry, with Amtrak Electricians, that there were
14  failures.  That's the record I have of somebody
15  from Amtrak contacting.
16      Q    Let me narrow the question considerably.
17           Are you aware whether anyone from
18  Advance spoke with anyone from Amtrak regarding the
19  design specifications, Plaintiff's Exhibit -- I'm
20  sorry, strike that -- Exhibit 22?
21      A    There is no indication that I have been
22  able to find that anyone from Amtrak spoke with

170

1   anyone from Advance about design specifications.
2       Q    Thank you.
3                   MR. NEAL:  Mr. Brooks, would you
4   please put Exhibit 18 before the witness.
5                   THE WITNESS:  Yes, sir.
                         Page 129

177645.txt

6    BY MR. NEAL:

7         Q    Okay.  This is a May 8, 2003 letter from

8    Mr. Ekinrode to Ms. Garret (ph) of Forum.

9    Mr. Ekinrode is with Amtrak.

10             Have you ever seen this document before,

11   sir?

12        A    I saw this letter attached to a letter

13   that was sent to Mr. Al Lassoff from Forum.

14        Q    I take it you didn't -- well, when did

15   you last see this letter?

16        A    Last see this letter?

17        Q    Yes.

18        A    I think I may have seen it yesterday.

19        Q    Okay.  Do you recall seeing it before

20   yesterday?

21        A    Yes.  I saw it when Mr. Lassoff supplied

22   some documents to me, including a letter from

                                             171


1    Forum.

2         Q    Do you know when that was, sir?  Just

3    give me a year.

4         A    Oh, this year.

5         Q    Okay.  That's what I am getting at.

6              I think I understand this letter is not

7    to Advance, but they are talking about this issue,

8    so I am going to read you a portion and ask you a

9    question about it.

10        A    Mm-hmm.

11        Q    In the first rather lengthy sentence,

12   Mr. Ekinrode states:  Amtrak has recently

                    Page 130

177645.txt
13   experienced significant ballast failures at its

14   Philadelphia 30th Street station and more recently

15   at the Providence, Rhode Island station.

16          Do you know when the ballast failures

17   that Mr. Ekinrode was talking about in this letter

18   communicated to Advance?

19      A   I believe that's what we were discussing

20   in the January and -- per the November 25th

21   letter, 2003, there's indication that we received

22   notification of failures at the Philadelphia

172

1   location in January of 2003 and some few months

2   later in the Providence location.

3      Q   Okay.  All right.  But I -- I heard your

4   testimony.  But the question I just asked really

5   dealt with the May 8th time period, so let's just

6   stick with that time period.

7      A   Okay.

8      Q   Around this time period did Advance

9   receive notice of the ballast failures that

10   Mr. Ekinrode was talking about in --

11      A   Yes, there's indication.  Yes, we have a

12   record of that.

13      Q   All right.  Mr. Ekinrode goes on to say:

14   Due to the epidemic nature of these ballast

15   failures, a very serious safety issue exists as to

16   lighting levels.

17          During the May 8, 2002 time period, was

18   Advance aware of an epidemic failure with its

19   ballasts?

20          MR. ZOFFER:  Objection to form
                    Page 131

177645.txt

21   and foundation.

22                    MR. NEAL:   That's why I asked

173

1    him if he was aware.

2                    MR. ZOFFER:   Well, you are

3    showing him a document that you've already

4    indicated is not his.

5                    MR. NEAL:   That's why I asked

6    him if he was aware versus --

7                    MR. ZOFFER:   If you asked him

8    without the document, I wouldn't object.   I'm

9    objecting --

10                   MR. NEAL:   Your objection is

11   noted.

12                   THE WITNESS:   Now you've got me

13   confused.

14                   MR. NEAL:   Read it back, please.

15        (The reporter read the record as requested.)

16                   MR. BROOKS:   And I take it your

17   question means independent of receiving a copy of

18   this letter?

19                   THE WITNESS:   Well, like I say,

20   this letter was attached to a letter from Forum.

21   BY MR. NEAL:

22        Q    Right.

174

1         A    And it was sent to Al Lassoff.

2         Q    Right.

3         A    I saw this letter for the first time

Page 132

177645.txt

 4   some weeks ago, maybe it was one or two months ago,

 5   in whatever time period it was I supplied it to my

 6   attorney and he supplied it to you.

 7         That was the first time I was aware of

 8   having an indication -- well, and actually this

 9   still only discusses two locations that -- okay,

10   there were a number -- there were significant

11   number of ballast failures but epidemic, I don't

12   know, you know, what that means.

13         We were aware, we have a record of the

14   failures at these two locations.  That's what we

15   were aware of.  And the letter from Forum asked us

16   to address these two locations and we did.

17     Q    Well, what did Advance do in response to

18   Amtrak's, and I guess later Forum's concern about

19   the ballast failures, at least during this time

20   period?  Let's stick with May 2003.  What did

21   Advance do?

22     A    We replaced ballasts and provided moneys

175

 1   to reimburse installations from what I understand.

 2     Q    Okay.  Now, what was wrong with the

 3   ballasts?

 4     A    There were some -- you know, in the

 5   report that we just went over, there were some what

 6   appears to be relatively random failure mechanisms.

 7     Q    How many total ballasts failed; do you

 8   know?

 9     A    Do I know what was -- what we were

10   notified of or total?

11     Q    Well, do both.  What were you notified

Page 133

177645.txt

12    of?

13         A    Well, we have an indication of 507.

14         Q    Okay.  You testified earlier that -- you

15    know, about some random failures.  You are not

16    considering -- you are not contending that 500 are

17    random failures, are you, sir?

18                   MR. ZOFFER:  Objections to form.

19                   MR. BROOKS:  Objection to form.

20                   THE WITNESS:  First of all, only

21    150 ballasts were returned to us.

22                   MR. NEAL:  I understand.

176

1                   THE WITNESS:  We did a sampling

2    of those.  Yes.  This was a high level of failures

3    for an installation, but there are many reasons for

4    failures, and to be honest -- I shouldn't use that

5    term.

6    BY MR. NEAL:

7         Q    I trust you.  Go ahead.

8         A    The high number of failures in an

9    installation can indicate a problem at an

10    installation, and so it does not immediately draw

11    us to an indication of a product defect.  So just

12    because you have one or two high failure locations

13    does not necessarily indicate that there's a defect

14    in the product.  We were not seeing the same types

15    of failure rates at other locations.  So it

16    appeared that there was something specific about

17    these locations, that -- at least the evidence

18    would seem to indicate that there was something

Page 134

177645.txt
19    specific about these locations that was causing a

20    very high failure rate.

21        Q    Okay.  Well, you say only 150 were

22    returned.  Do you know why the other roughly 350 or

177


1    so were not returned, sir?

2        A    No, I don't know that.

3        Q    Okay.  Of the 150, what was wrong with

4    the 150?

5        A    We only tested a sampling of them.  And

6    we went over the failures previously.

7        Q    You say "a sampling" of the 150.  How

8    many did you sample?

9        A    I think the number was six or seven.

10       Q    Six or seven.  So my math is not great

11   but less than 5 percent, less than 4 percent;

12   correct?

13       A    Yes.

14       Q    The other 96 or roughly 96, because my

15   math is not great, were never even tested to figure

16   out what the problem was; is that your testimony,

17   sir?

18                  MR. BROOKS:  Objection.

19                  THE WITNESS:  Well, if you're

20   looking for a -- if there's a design defect, you're

21   very -- you know, you will expect to find that you

22   will have the same failure mechanism in your field

178


1    analysis, so you only do a sampling.  We would have

2    done -- you know, we could have done more had more

Page 135

177645.txt

3   ballasts been sent back to us.

4   BY MR. NEAL:

5        Q    You could have done more with the other

6   144 you didn't test; correct?

7                    MR. GRIMSLEY:  Object to form.

8                    MR. BROOKS:  Object to form.

9                    THE WITNESS:  I suppose we could

10  have.

11  BY MR. NEAL:

12       Q    Okay.  Well, okay.

13            And in this letter it refers to two

14  stations, the 30th -- Philadelphia 30th Street

15  station; the Providence, Rhode Island station.  Are

16  you aware of ballast failures at any of the other

17  five stations that are at issue in this litigation?

18       A    Well, today I was shown a document that

19  would indicate there were failures at other

20  locations.

21       Q    Which other locations, sir, and please

22  identify the exhibit you are looking at?

                                                    179

1        A    I am looking at Exhibit 66, F00651.

2   And --

3        Q    Which one is that?

4        A    I'm sorry?

5        Q    Go ahead, sir, continue.

6        A    Oh, I'm sorry.  No, I'm sorry, this

7   doesn't even -- I'm sorry, you are right.  This

8   doesn't talk about failures at these locations.

9        Q    Okay.  Then back --

                        Page 136

177645.txt

10      A    No, I have no record of any high failure
11  rate at any other location.
12      Q    That's not the question I asked you.  I
13  didn't ask about a high failure rate.
14           I'm asking whether or not any of the
15  ballasts that Advance supplied to Forum, which were
16  ultimately in the luminaries of seven different
17  stations, whether any of the other five stations we
18  haven't discussed had ballast failures?  I'll start
19  again.
20           The question is this, sir:  Other than
21  the two stations that are identified in this
22  exhibit, Philadelphia 30th Street station and the

                                                    180


 1  Providence, Rhode Island station, are you, on
 2  behalf of Advance, aware that any of the -- any of
 3  the other ballasts that Advance supplied failed?
 4                   MR. BROOKS:  Objection, asked
 5  and answered.
 6                   MR. NEAL:  Most certainly was
 7  not.
 8                   MR. BROOKS:  Most certainly was
 9  about three hours ago.
10                   THE WITNESS:  Yeah, I have no
11  records of any other RAs from Amtrak.
12                   MR. BROOKS:  In fairness to the
13  witness, there was testimony given three hours ago
14  on this issue.  And there was an exhibit.
15                   MR. NEAL:  Thanks.
16  BY MR. NEAL:
17      Q    Okay.  The -- this letter goes on to say
                    Page 137

177645.txt

18    they -- that Mr. Ekinrode requests immediate

19    corrective action to take place, and it is directed

20    to Forum.

21            Do you know if Forum took any immediate

22    corrective action with regard to this letter?

                                                    181

1      A    They sent us a letter.

2      Q    And what date letter is that, sir?  Is

3    that already marked?

4      A    Exhibit 68.  Advance 00016.

5      Q    Okay.  And so you received Exhibit 68.

6      A    Yes.

7      Q    In the third paragraph that letter

8    states:  We understand -- this is the letter from

9    Ms. Garret to Mr. Lassoff.  It states:  We

10    understand that Advance will continue to stand by

11    its product and provide the necessary replacement

12    ballasts to perform the replacement work that

13    Amtrak is now insisting upon.

14            Do you see that language, sir?

15    A    Yes, sir.

16    Q    Is it true during this time period,

17    roughly July of 2003, that Advance agreed to

18    continue to stand behind its product and provide

19    replacement ballasts?

20    A    Yes, sir.

21    Q    And is it your testimony, sir, that -- I

22    think it is your testimony that Advance supplied

                                                    182

177645.txt

1  all the replacement ballasts that were requested?

2      A    Yes.  That's what all the evidence

3  indicates.

4      Q    What evidence are you referring to, sir?

5      A    All of our RAs and all the documentation

6  I could find concerning this matter.

7      Q    The evidence you are referring to is the

8  documents at Advance; correct?

9      A    I have not seen any other documents that

10  contradict it.

11              MR. BROOKS:  Take a two-minute

12  break?

13              MR. NEAL:  Sure.

14      (Thereupon, a recess was taken.)

15              MR. NEAL:  Mr. Brooks, if you

16  will show the witness Exhibit 73, please.

17              THE WITNESS:  Oh, I have 73.

18              MR. NEAL:  We have already asked

19  you questions about this one.

20  BY MR. NEAL:

21      Q    Okay.  I am not going to go through much

22  of this document.  You have already done it.  But

                                                    183


1  in the upper right-hand corner there is a date.

2  It's 1/16/2003.  Do you see that?

3      A    Yes.

4      Q    What date does that signify?

5      A    This is the date the return

6  authorization was generated.

7      Q    Okay.  And this return authorization

8  also mentions that replacements were shipped at no

                        Page 139

177645.txt

9   charge.  Do you see that under the special

10   instructions?

11       A    Yes.

12       Q    Do we know when these replacement

13   ballasts were shipped?

14       A    If the attached document, 126, is what

15   we expect it to be, then it would have been between

16   the 15th and the 16th.

17       Q    Of?

18       A    Of January 2003.

19       Q    Okay.

20       A    By the next day, in other words, from

21   when we were told.

22       Q    Okay.  Let me direct your attention --

184

1                    MR. NEAL:  Joe, if you could get

2   Exhibit 32.

3   BY MR. NEAL:

4       Q    Just take a look at that and let me know

5   when you have had a chance to look at it, please.

6       A    Okay.

7       Q    Okay.  Again, there is a date in the

8   corner that says, right, upper right-hand corner:

9   October 29, 2003.  Do you see that?

10       A    Yes.

11       Q    Would that be the shipment date or the

12   date that the, I guess, replacements were

13   authorized?

14       A    This would be -- well, this indicates

15   that replacements had been shipped by that date.

Page 140

177645.txt
16        Q    Okay.  And then down below in

17   handwriting there's -- it says delivery:  11/3/03.

18   Do you see that?

19        A    Yes.

20        Q    Do you know whose handwriting that is?

21        A    No, I don't.

22        Q    It says from IL.  Do you know what that

185

1   would mean?

2        A    That is the abbreviation for Illinois,

3   but I don't know.  Could have been our Hanover

4   warehouse.

5        Q    Okay.  Would you agree with me, sir,

6   that according to this document, it is -- at least

7   November of 2003, Advance was still replacing

8   defective ballasts?

9                    MR. ZOFFER:  Object to form.

10                    MR. BROOKS:  Object to form.

11                    THE WITNESS:  Are you saying

12   does this indicate that we were still replacing

13   defective ballasts in November of 2003?  Is that

14   the question?

15   BY MR. NEAL:

16        Q    That's exactly what I'm saying.

17        A    This would indicate that, yes.

18        Q    Right.  And I take it you agree with me

19   there was -- something was still wrong with the

20   ballasts as of November 2003, otherwise Advance

21   wouldn't be replacing ballasts; correct?

22                    MR. ZOFFER:  Objection to form.

186

Page 141

177645.txt

```
 1                    MR. BROOKS:  Objection to form.
 2                    THE WITNESS:  There was a report
 3    of having something wrong with ballasts, and we
 4    were sent replacement ballasts in this time frame.
 5    BY MR. NEAL:
 6        Q    You wouldn't have sent replacements
 7    unless something was wrong with the original
 8    ballasts; correct?
 9                    MR. ZOFFER:  Same objection.
10                    MR. BROOKS:  Objection to form.
11                    THE WITNESS:  We have some
12    replacements.  We don't wait for returns to come in
13    before we send replacements.  We never received
14    these even to look at them, so we couldn't even
15    verify these were defective.
16    BY MR. NEAL:
17        Q    Okay.  But -- would you concur, sir,
18    that during this time period there was clearly a
19    problem with these ballasts?
20                    MR. ZOFFER:  Objection.
21                    MR. BROOKS:  Objection to form.
22                    THE WITNESS:  No, it's not clear
```

                                                        187

```
 1    there was a problem with these ballasts.
 2    BY MR. NEAL:
 3        Q    Well, in the interrogatories, in their
 4    interrogatory responses, Forum's interrogatory
 5    responses, they claim that the ballasts were
 6    defective.  Do you agree with that, sir, that the
```

                          Page 142

177645.txt

7   ballasts were defective?

8        A    It has not been shown to me that the

9   ballasts were defective.

10       Q    By your own testimony at least 500

11  ballasts were replaced; correct?

12       A    Yes.

13       Q    At least?

14       A    Yes.

15       Q    So if there wasn't a problem with these

16  ballasts, why would Advance have to replace 500 of

17  them?

18                 MR. BROOKS:  Objection, asked

19  and answered.  Try again.

20                 THE WITNESS:  There is

21  indication that there were other defects in the

22  luminaire that could have allowed water to come in

188

1   contact with the ballast and that would cause a

2   ballast to malfunction.

3   BY MR. NEAL:

4        Q    Okay.  What other defects are you

5   referring to, sir?

6        A    Well, my understanding of this case is

7   that there are some kind of clips that were not

8   holding luminaires together properly.  And allowing

9   the -- were not producing a weathertight seal.

10       Q    As we sit here today, is that your

11  understanding as to why the ballasts were failing,

12  because the clips weren't working correctly?

13       A    We have not -- we have not seen any

14  ballasts since 2003.  I wish I had -- if I had some

Page 143

177645.txt

15    ballasts, I could do some analysis of them.  But we

16    received ballasts in under a normal return

17    authorization, we do some investigation of these

18    ballasts to look for trends in failures.  One

19    failed location is not enough to establish a trend,

20    compared with the many thousands of ballasts of any

21    given model and many millions, many tens of

22    millions of ballasts we ship every year.  Having

☐                                                                    189


 1    one installation with 75 failures is not -- does

 2    not attract a lot of attention when you ship over

 3    50 million ballasts a year.

 4                    MR. NEAL:  Okay.

 5          (Deposition Exhibit No. 78 - Bates stamp

 6          Advance 00045 through 00046 - was marked for

 7          identification.)

 8    BY MR. NEAL:

 9          Q    If you could, sir, just take a minute

10    and read the first page of this.  You can read all

11    of it if you like --

12          A    Mm-hmm.

13          Q    And then I am going to ask you a few

14    questions.  Take your time.

15          (Pause in proceedings.)

16          A    Okay.

17          Q    This is -- Exhibit 78 is a number of

18    e-mails.  The top one was dated May 18, 2005, and

19    it's from Mr. Lassoff to a number of individuals.

20                    Have you ever seen this e-mail before,

21    sir?

Page 144

177645.txt

22        A     Yes.

190

1        Q     When is the first time you saw this
2     e-mail?
3        A     When it was sent to me by Mr. Lassoff,
4     this year, in response to my investigation of this
5     matter.
6        Q     Okay.  Your investigation of this
7     matter?
8        A     Well, my search for information in
9     response to this matter.  Or response to my
10    attorney's instructions.
11       Q     I am trying to separate this into two
12    things.  One is talking about a search for
13    documents?
14       A     Search for documents.
15       Q     And two, this investigation that your
16    counsel told us of, at his direction, which is all
17    work product under the now famous Upjohn opinion.
18             Let's talk about your search for
19    documents.  Is that what you were referring to,
20    sir?  Are you referring to this investigation at
21    the direction of your lawyer?
22       A     Well, the search for documents was my

191

1     investigation.  I was searching for information
2     concerning this matter.
3        Q     Okay.
4        A     And it mostly involved documents.
5        Q     Okay.  In the second sentence of Mr. --
                      Page 145

177645.txt

 6    this top e-mail, May 18 e-mail, it says:  There has

 7    definitely been units that were identified as being

 8    from a bad date code batch.  This is a fact.

 9            What is Mr. Lassoff talking about there,

10    do you know?

11        A    You are going to have to ask

12    Mr. Lassoff.

13        Q    You don't know anything about that?

14        A    Well, I tried to -- I tried to find out

15    if there was such a bad date code batch, and if you

16    look at Mr. Tindel's comments of later -- well,

17    let's see.  Well, earlier.

18        Q    Earlier.

19        A    He's indicating that -- and Mr. Tindel

20    is the -- from our quality department, he's

21    disputing that there is a well-known problem with

22    this product.

                                                    192

 1        Q    Well, that's exactly what I am getting

 2    to, sir, 'cause, you know, just a few minutes ago

 3    you said something along the lines of there's no

 4    major issue with this design.  In fact, you quoted

 5    that directly earlier in your testimony?

 6        A    Yes, sir.

 7        Q    Right.  So that's why I am presenting

 8    this to you, because it seems like Mr. Lassoff may

 9    have a different opinion.  So did you ever talk to

10    Mr. Lassoff about this bad date code batch?

11        A    I asked him who would have evidence of

12    this, and he could not tell me.  Mr. Lassoff is not

                         Page 146

177645.txt
13    technically capable of determining the problems

14    with ballasts, and without some substantiation of

15    his comment, this is -- he is a salesman, you know.

16    He --

17          Q    Fair enough.  I understand.  My question

18    is a little different.  My question is, did you

19    have a conversation with Mr. Lassoff about a bad

20    date code batch?

21                    MR. BROOKS:  When?

22                    MR. NEAL:  At any time.

193

1                    THE WITNESS:  We -- during our

2    whatever, if we're calling this an investigation.

3                    MR. BROOKS:  Well, if that's the

4    only conversation you had with him, then your

5    testimony on that issue is complete.

6                    THE WITNESS:  Okay.

7                    MR. NEAL:  I'm sorry?

8                    MR. BROOKS:  If that's the only

9    conversation he had with him, then his testimony on

10    that issue is complete.

11                    MR. NEAL:  I disagree entirely.

12    Let's set the factual predicate for this because I

13    am really quite interested about this vast work

14    product privilege you think exists.

15    BY MR. NEAL:

16          Q    I am asking whether you had a

17    conversation with Mr. Lassoff without counsel

18    present about whether there was a bad date code

19    batch, and that's just a yes or no question?

20          A    I believe that conversation --
                        Page 147

177645.txt

21                     MR. BROOKS:  He told you that

22   that's just a yes or no question.

                                                    194


1                     THE WITNESS:  I don't recall.

2   BY MR. NEAL:

3       Q    You don't recall whether you had a

4   conversation like that with Mr. Lassoff or you

5   don't recall whether counsel was also present?

6   Because that's two different things.

7                     MR. BROOKS:  That's what you get

8   when you ask a compound question, counsel.

9                     MR. NEAL:  Thank you,

10   Mr. Brooks.

11   BY MR. NEAL:

12      Q    Did you understand my question?

13      A    I don't recall.  I can't state

14   definitively that it was when Mr. Brooks was

15   present but I think it was.

16      Q    Okay.  Well, that's -- that is a fair

17   distinction.  I do not and I am not in any question

18   I am asking today trying to elicit any

19   communications that you had with your counsel or

20   with any other --

21      A    Most of --

22                     MR. BROOKS:  Wait, there is no

                                                    195


1   question pending.  Please, you are here to answer

2   questions.

3   BY MR. NEAL:

                      Page 148

177645.txt
4        Q    I am not trying to elicit conversations

5    with lawyers. I promise. What I am trying to do

6    is, there is obviously a difference of opinion

7    between you and Mr. Tindel and Mr. Lassoff, who has

8    been identified in your own interrogatory responses

9    as someone with knowledge. So I am trying to get

10   to the basis of this -- well, I won't call it

11   dispute but just difference of opinion as to what's

12   going on here.

13        So I am asking you about any

14   conversations you may have had with him, outside

15   the presence of counsel, regarding a bad date code

16   batch. Were there any such conversations?

17                MR. BROOKS:  Objection. And so

18   it's clear, I am not making a distinguishing matter

19   of whether or not I was present or not. My

20   objection is that if an investigation of a

21   complaint that was filed in Federal Court is being

22   made within the corporation at the direction of

196

1    counsel, then that is work product and/or

2    attorney-client privilege under Upjohn, and I am

3    objecting and I'm instructing the witness not to

4    answer.

5                MR. NEAL:  There is no way that

6    the work product privilege could possibly be that

7    broad because if it were, any lawyer in any case

8    would conduct investigation and then shut everybody

9    up. So we will tee that up.

10               MR. BROOKS:  Okay.

11               MR. NEAL:  But the question
                         Page 149

177645.txt

12    was -- and your lawyer may instruct you.

13    BY MR. NEAL:

14         Q    But was there a conversation, is right

15    where I am right now, outside of the presence of

16    counsel?  That's the question that's before you.

17                       MR. NEAL:  Are you instructing

18    him not to answer that?

19                       MR. BROOKS:  I am instructing

20    him not to answer that because it's been asked and

21    answered, and what he has testified is that he

22    doesn't know whether counsel was present or not.

197

1     And since he doesn't know whether counsel was

2     present or not, we are not in a position to make a

3     determination even if we were to accept what we

4     think is your erroneous interpretation of Upjohn.

5     BY MR. NEAL:

6          Q    Is Mr. Lassoff still with Advance, sir?

7          A    He is retired but he has been retained

8     as a consultant.

9          Q    Really?  When did he leave the

10    employment of Advance?

11         A    I don't know -- I don't recall the exact

12    time frame.

13         Q    I didn't ask you the exact time frame.

14    Just give me a year.  What year did Mr. Lassoff

15    leave the employment of Advance?

16         A    I don't know.

17         Q    You don't know?

18         A    No.

Page 150

177645.txt

19     Q    Why was he made a consultant?

20     A    We still could use his services.

21     Q    Is he an employee or is he an

22   independent contractor?

198

1     A    I don't know.  I'm sorry, employee?

2     Q    Yes.

3     A    He's not an employee.

4     Q    Okay.  Do you have a contract with him?

5     A    I don't know.

6              MR. ZOFFER:  Do you know,

7   Mr. Brooks?  Is he still an employee?  This goes to

8   your work product privilege, by the way.

9              MR. BROOKS:  I am not under

10   oath, and I am not here to testify.

11              MR. NEAL:  So I take it you

12   won't answer the question on the record?  We are

13   setting this up for resolution by the Court.

14   That's why I'm trying to figure out if he's not --

15   if Mr. Lassoff is not an employee of the company

16   and wasn't when you conducted this investigation,

17   then I'm at a loss to see how there could be an

18   attorney-client or a work product privilege.

19              MR. BROOKS:  Then you will have

20   to continue to be at a loss then.

21              MR. NEAL:  So you are not going

22   to answer the question?  You are not going to tell

199

1   me that so I can set up the privilege?

2              MR. BROOKS:  I have no -- I will
                    Page 151

177645.txt

3    tell you on the record.  I have no information, no

4    personal information about the specific status of

5    Mr. Lassoff's relationship with Advance at this

6    time.

7                        MR. NEAL:  Okay.

8    BY MR. NEAL:

9        Q    Listen.  Your lawyer has made an

10   instruction.  I take it you are going to follow his

11   instruction; correct?

12       A    Yes, sir.

13       Q    Very good.  Let's move on.

14            Mr. Lassoff goes on in his e-mail to

15   state:  We have replaced -- strike that.

16            According to my attached letter to Forum

17   which has -- which was based on info, information,

18   provided to me from ATC warranty, we have replaced

19   over 500 pieces.

20            Do you know what he refers to when he

21   says "ATC warranty," sir?

22       A    That's the normal shorthand for Advance

                                                      200


1    Transformer Company.

2        Q    Okay, thank you.

3            He goes on to say:  How can ATC,

4    Advance, say there is no problem?

5            Did you ever have a discussion with

6    Mr. Lassoff regarding his belief that there must

7    have been a problem with these if we replaced 500

8    of the ballasts?

9        A    I think I have been instructed by my

                       Page 152

177645.txt

10   attorney not to say.

11                    MR. BROOKS:  No, no, no.  You

12   haven't been instructed by me unless I give an

13   instruction.

14                    THE WITNESS:  Okay.  I'm sorry.

15                    MR. BROOKS:  And you really must

16   listen to the question which asks whether you ever

17   had such a conversation.

18                    THE WITNESS:  Yes.

19   BY MR. NEAL:

20      Q    Okay.  Can you tell me about that

21   conversation, please?

22                    MR. BROOKS:  First, I would

                                              201


1    request that you ask him when he had that

2    conversation.

3                    MR. NEAL:  Well, as you said,

4    you are not testifying, you are not asking

5    questions, so --

6                    MR. BROOKS:  Okay.  Well, then

7    we will go off the record and I will consult with

8    the witness to find out whether or not his answer

9    to that question would divulge what we believe to

10   be attorney-client privilege or work product.

11                    MR. ZOFFER:  For the sake of

12   time, we're going to get Mr. Lassoff.  Couldn't we

13   direct this to Mr. Lassoff, see, because I'd like

14   to know the answers to these questions, too.

15                    MR. NEAL:  I bet you would, too.

16   The difference between Mr. Lassoff is that,

17   remember, we were told he was a former employee.

                    Page 153