## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.: 1:05CV01837 |
| v. | ) ) | Judge Paul L. Friedman |
| FORUM, INC., | ) ) | Magistrate Judge Deborah A. Robinson |
| Defendant and Third-Party Plaintiff, | ) ) ) | |
| v. | ) ) | **FILED ELECTRONICALLY** |
| ADVANCE TRANSFORMER, CO. and SOUTHCO, INC., | ) ) ) | |
| Third-Party Defendants. | ) ) | |

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF FORUM, INC.'S MOTION FOR SUMMARY JUDGMENT RAISING THE DEFENSE OF THE STATUTE OF LIMITATIONS

AND NOW, comes Defendant and Third-Party Plaintiff, Forum, Inc., by and through its attorneys, Dickie, McCamey & Chilcote, P.C., and files the within Statement of Points and Authorities in Support of Motion for Summary Judgment Raising the Defense of the Statute of Limitations.

### INTRODUCTION

This lawsuit allegedly arises out of the purchase and sale of luminaires in 1998 and 1999. Defendant and Third Party Plaintiff, Forum, Inc. ("Forum"), designed, manufactured, sold to Plaintiff, National Railroad Passenger Corporation ("Amtrak"), and warranted for a period of one year certain luminaires that Amtrak installed and subsequently used at its northeast corridor station platforms. In 2005, however, approximately <u>six to seven years later</u>, Amtrak sued Forum

as a result of problems that it allegedly experienced while installing said luminaires. As discussed herein, Amtrak's 2005 action is untimely and barred by the applicable statutes of limitations. Even Amtrak questions the timeliness of its action; it is not coincidental that Amtrak, after setting forth preliminary facts in its First Amended Complaint, attempts to circumvent the statute of limitations issue by ineffectively attempting to revoke its prior acceptance of the Forum-supplied luminaires after using the same for more than five years. Amtrak was well aware that the claims which it wanted to assert, and ultimately asserted, against Forum were untimely and, accordingly, barred.

In connection with Amtrak's filing suit, the parties began undertaking their respective discovery efforts and, *inter alia*, made their initial disclosures pursuant to Rule 26 of the Federal Rules of Civil Procedure. Forum, during this time, also joined Advance Transformer, Co. ("Advance") and Southco, Inc. ("Southco") as Third-Party Defendants for reasons noted herein. Then, in August, 2005, the Court held a status conference during which time the parties discussed the significance and applicability of the statute of limitations defense under the circumstances now presented by this case. As a result, the Court, on August 25, 2006, and September 12, 2006, entered Orders that properly focused the parties' discovery efforts to the issue of the statute of limitations and instructed the parties to file dispositive motions. The parties have now completed their substantial discovery efforts in this regard. Their efforts included, but were not limited to, deposing numerous representatives of the parties, including employees and former employees, responding to multiple sets of written discovery, including requests for admissions and requests for substantial documentation, and subpoenaing documents from third parties.

As noted, the Court, through the aforementioned Orders, also directed the parties to brief the issue of the statute of limitations in order to facilitate its rendering a decision as to whether various claims advanced by various parties are time barred. Accordingly, Forum, in compliance with the most recent Order setting forth the briefing deadlines, submits this Statement of Points and Authorities in Support of Motion for Summary Judgment Raising the Defense of the Statute of Limitations. All of the claims advanced by Amtrak are time barred by the applicable statutes of limitations, as discussed herein.

## STANDARD OF REVIEW

A court's granting summary judgment is proper where "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact[,] and that the moving party is entitled to a judgment as a matter of law.'" *Freeman v. United States EPA*, 2004 U.S.Dist. LEXIS 21784, *8-9 (D. D.C. 2004) (Citations omitted). "To determine which facts are 'material,' a court must look to the substantive law on which each claim rests." *Freeman*, 2004 U.S.Dist. LEXIS at *9 (Citations omitted). "A 'genuine issue' is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action." *Id*. (Citations omitted).

A court, "[i]n ruling on a motion for summary judgment, . . . must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true." *Id*. (Citations omitted). "A nonmoving party, however, must establish more than 'the mere existence of a scintilla of evidence' in support of its position." *Freeman*, 2004 U.S.Dist. LEXIS at *9 (Citations omitted). "To prevail on a motion for summary judgment, the moving party must show that the nonmoving party 'failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial.'" *Id.* at *9-10 (Citations omitted). By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.* at *10 (Citations omitted).

Additionally, a court, when deciding a motion for summary judgment, should also consider that "the nonmoving party may not rely solely on allegations or conclusory statements." *Id.* (Citations omitted). "Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor." *Id.* (Citations omitted). "If the evidence 'is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Id.* (Citations omitted).

The facts and circumstances surrounding this lawsuit are one sided and dictate the dismissal of Amtrak's claims on summary judgment. There is no genuine issue of material fact with respect to the various delivery dates and the early knowledge which Amtrak possessed concerning the underlying problems. Additionally, as to Amtrak's claim for revocation of acceptance, resolution of this claim is appropriate at the summary judgment stage. *Mariner Water Renaturalizer of Washington, Inc. v. Aqua Purification Systems, Inc.*, 214 U.S. App. D.C. 248, 665 F.2d 1066, 1069 (1981)(quoting *Meyers v. Antone*, 227 A.2d 56, 58 (D.C.App. 1967); *Campbell Music Co. v. Singer*, 97 A.2d 340, 341 (D.C.Mun.App. 1953)).

## STATUTES OF LIMITATIONS

The Court, in its exercise of diversity jurisdiction, is required to apply the substantive law of the jurisdiction in which it sits; for the sake of completeness, the Court, similarly, is required to apply federal procedural law in diversity cases. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). Stated differently, whether a federal court, sitting in diversity,

applies state law or federal law depends on whether the law to be applied is substantive or procedural in nature.  The Court, however, does not have to consider the substantive/procedural distinction because the characterization of the law surrounding the issue of the statute of limitations is well established.  Under *Erie* and its progeny, statutes of limitations are substantive, and federal courts, like this one, are required to follow state law (*e.g.*, District of Columbia law) on that issue.  *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S. Ct. 1464, 89 L. Ed. 2079 (1945).

Amtrak advanced the following claims against Forum in its First Amended Complaint: (a) rejection/revocation of acceptance, (b) breach of contract, (c) breach of implied warranty of good faith and fair dealing, (d) breach of express warranty, (e) breach of implied warranty, (f) negligence, (g) fraud, and (h) unjust enrichment.  (*See*, Amtrak's First Amended Complaint.) The various statutes of limitations that apply to each of the aforementioned claims vary and provide for a limitation period of either three years or four years.  The longest potentially applicable limitation period for Amtrak's claims is the one set forth in the District of Columbia's version of the Uniform Commercial Code at D.C.Code § 28:2-725.[1]

---

1. Amtrak's breach of contract, breach of warranty, and revocation of acceptance claims are at the heart of its First Amended Complaint.  While Forum's briefing efforts are concentrated on these claims, Forum, to a certain extent, will address all of Amtrak's claims in the interest of completeness.  Forum's rationale for this submission is twofold. First, a four-year statute of limitations period governs Amtrak's claims for breach of contract, breach of express warranty, breach of implied warranty, and revocation of acceptance.  Amtrak's other claims (*e.g.*, breach of implied warranty of good faith and fair dealing) are governed by a three-year statute of limitations period.  To the extent that Forum successfully demonstrates that Amtrak's First Amended Complaint is time barred by a four-year statute of limitations, Amtrak's First Amended Complaint certainly is time barred by any three-year statutes of limitations. Second, the District of Columbia's economic loss doctrine precludes Amtrak from recovering under their theories of negligence and fraud.  *See*, *RLI Ins. Co. v. Pohl, Inc.*, 2006 U.S.Dist. LEXIS 45958, *9 (D. D.C. 2006) (stating, "the District of Columbia 'has not authorized tort recovery for purely economic losses in a contract setting'").  Third, Amtrak's claim for unjust enrichment is an alternative theory of liability that only finds applicability where a party to an express agreement refutes its existence.  *Schiff v. American Ass'n of Retired Persons*, 697 A.2d 1193, 1194 (D.C. 1997); *Bloomgarden v. Coyer*, 156 U.S. App. D.C. 109, 479 F.2d 201, 210 (D.C. Cir. 1973).  Even so, said claim would be subject to a three-year statute of limitations.  *Construction Interior Systems, Inc. v. Donohoe Companies, Inc.*, 813 F.Supp. 29, 33 n.4 (D. D.C. 1992).

D.C.Code § 28:2-725(1) provides:

> An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

D.C.Code § 28:2-725(1). D.C.Code § 28:2-725(2), in pertinent part, provides:

> A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made . . ..

D.C.Code § 28:2-725(2). As the aforementioned provisions explain, in the context of a contract for the sale of goods, a claim for breach of contract must be commenced within four years of the date of the breach, irrespective of any aggrieved party's alleged lack of knowledge of said breach, and a claim for breach of warranty must be commenced within four years from the date on which the goods were delivered. *See also*, *Long v. Sears Roebuck & Co.*, 877 F.Supp. 8, 13-14 (D. D.C. 1995) (recognizing, "the statute of limitations that applies to the claims for breach of express and implied warranties is four years"). Amtrak's breach of contract claim, therefore, is governed by the aforementioned four-year statute of limitations. Further, the governing statute of limitations began to run on the date that Forum allegedly breached its contract with Forum. Amtrak's claims for breach of express warranty and breach of implied warranty, likewise, are governed by the four-year statute of limitations. The statute of limitations applicable to Amtrak's breach of warranty claims began to run on the various dates of delivery.[2] In paragraphs which follow, Forum fully analyzes the applicability and running of these statutes of limitations.

---

2. Amtrak's claim for revocation of acceptance is also governed by the four-year statute of limitation set forth at D.C.Code § 28:2-725. Amtrak's revocation of acceptance claim is further barred as untimely under Section 2-608 of the D.C. UCC. These propositions are discussed in the final section of this Statement.

The District of Columbia's three-year statutes of limitations, set forth at D.C.Code § 12-301(7) or (8), govern Amtrak's claims for breach of implied warranty of good faith and fair dealing, negligence, and fraud. The former section governs claims "on a simple contract, express or implied." D.C.Code § 12-301(7). The latter section governs claims "for which a limitation is not otherwise specifically prescribed." D.C.Code § 12-301(8). First, claims for breach of implied warranty of good faith and fair dealing are governed by the three-year statute of limitations set forth at D.C.Code § 12-307(7). *Riddell v. Riddell Washington Corp.*, 680 F.Supp. 4, 10 (D. D.C. 1987), *aff'd in part*, *rev'd in part* 866 F.2d 1480, 1497-1498 (D.C. Cir. 1989). Second, *Prouty v. National R. Passenger Corp.*, 572 F.Supp. 200 (D. D.C. 1983), citing D.C.Code § 12-301(8), provides, "[t]he statute of limitations period for negligence claims is three years." *Id.* at 206. Third, *King v. Kitchen Magic, Inc.*, 391 A.2d 1184 (D.C. 1978), referencing D.C.Code § 12-301(7) and (8), indicates that the applicable statute of limitations period for fraud claims is three years. *See*, *id.* at 1185 (suggesting that claims involving allegations of frauds "must be brought within three years").

Irrespective of the statute of limitations which applies to the claims in Amtrak's First Amended Complaint, those claims are both governed and barred by a three-year or, at most, a four-year statute of limitation.

## ARGUMENT

**I. The four-year statute of limitation that governs Amtrak's breach of contract claim (D.C.Code § 28:2-725) began to run on May 20, 1999, *i.e.*, the date on which Amtrak awarded Forum the manufacturing phase of the contract.**

For the purpose of argument only, Forum contends that to the extent that it is liable to Amtrak under a breach of contract theory, May 20, 1999, the date on which Amtrak awarded Forum Phase 2, is the latest date by which Forum would have committed a breach of contract in

this case.  (*See*, Letter from Amtrak's Michael McGraw dated May 20, 1999 and accompanying documents (Amtrak 000555-57) attached hereto as **Exhibit "D"**).  Accordingly, May 20, 1999, is also the triggering date on which the applicable four-year statute of limitations began to run.

As discussed previously, Amtrak's program to develop and manufacture luminaires for its northeast corridor station platforms was divided into two phases.  (*See*, Forum's Statement of Material Facts, which accompanies this Statement.)  The first phase involved development of an acceptable prototype—prototype development.  The second phase involved the manufacture of luminaires in reliance upon and in accordance with the prototype accepted by Amtrak—manufacture of luminaires.  Based upon the prototype submitted by Forum, Amtrak approved Forum's design, awarded Forum Phase 2, and directed Forum to manufacture luminaires for its various stations pursuant to the accepted prototype.  The Phase 2 award came on May 20, 1999.  (*See*, Letter from Amtrak's Michael McGraw dated May 20, 1999 and accompanying documents (Amtrak 000555-57) attached hereto as **Exhibit "D"**.  *See also*, Forum's Statement of Material Facts, which accompanies this Statement).  When Forum manufactured the requested luminaires during Phase 2, Forum merely was manufacturing, or mass producing, the luminaires in accordance with the specifications that Amtrak already accepted.  To the extent that Forum committed a breach of contract, which it specifically denies, that breach would have occurred at the conclusion of prototype development.  That is the point in time when Forum's compliance with the relevant specifications would have been at issue.  Once Forum began manufacturing the luminaires during Phase 2, Forum was acting pursuant to the design specifications provided and prototype accepted by Amtrak.  Any breach of contract would have preceded this time, which

Forum has identified as the final day of Phase 1 and the initial day of Phase 2, *i.e.*, May 20, 1999.[3]

Amtrak's breach of contract claim, which was first asserted in its September 16, 2005, Complaint, is subject to a May 20, 1999, triggering date. The corresponding four-year statute of limitation period consequently expired on May 19, 2003. Amtrak's 2005 breach of contract claim, therefore, is untimely and barred.

### II. The four-year statute of limitation that governs Amtrak's breach of warranty claims (D.C.Code § 28:2-725) ran consistently with the delivery of luminaires, which occurred between August, 1999, and February, 2001.[4]

Pursuant to the previously discussed provision of the UCC, the uncontroverted evidence related to Forum's delivery dates establishes grounds for summary judgment. As with Amtrak's breach of contract claim discussed above, Amtrak's breach of warranty claims similarly fail.[5] A claim for breach of warranty must be commenced within four years from the date on which the goods were delivered. D.C.Code § 28:2-725(2); *see also*, *Long v. Sears Roebuck & Co.*, 877 F.Supp. 8, 13-14 (D. D.C. 1995) (recognizing, "the statute of limitations that applies to the claims for breach of express and implied warranties is four years" from the date of delivery).

---

3. At the close of discovery, there is no evidence to refute the triggering date for Amtrak's breach of contract claim. Amtrak merely offered the following discovery response:

> Amtrak objects to this Request on the ground that it is vague and ambiguous in that the phase "Amtrak awarded Forum" is vague, ambiguous, undefined, and susceptible of multiple interpretations. Subject to, and without waiving, the general and specific objections set forth above, Amtrak states that, after making a reasonable inquiry, the information known or readily obtainable by Amtrak is insufficient to enable Amtrak to either admit or deny this Request at this time. Discovery is ongoing and Amtrak will supplement its response to this Request as additional information becomes available.

(*See*, Plaintiff's Response to Defendant and Third Party Plaintiff's Requests for Admissions and Interrogatory (Response #4), attached hereto as **Exhibit "A"**). Further, Amtrak has failed to offer evidence which, in any way, refutes the May 20, 1999, triggering date.
4. (*See*, Affidavit of Paula L. Garret, attached hereto as **Exhibit "E"**). The Affidavit of Paula L. Garret summarizes the various delivery dates, which are set forth in the various shipping records, invoices, and emails exchanged by the parties during discovery, as well as the related dates of invoice and payment.
5. As argued in the previous section, Amtrak's breach of contract claim is subject to a May 20, 1999, triggering date. In the alternative, the triggering dates associated with Amtrak's breach of warranty claims apply with equal force to Amtrak's breach of contract claim.

The documents of record and testimony provided during discovery reveal that Forum delivered all of the original luminaires between August, 1999, and February, 2001. (*See, e.g.,* Amtrak's OIG Review of Forum Platform Lights, dated March 9, 2003, (Amtrak 004454-72) attached hereto as **Exhibit "F"**). Specifically, the chart depicted in this document (at Amtrak 004460) and corresponding statement by Amtrak Auditors that "[t]he new lights were originally installed [and, therefore, delivered] at the seven stations in late 1999 and early 2000" are probative of the fact that the luminaires were delivered to Amtrak no later than February, 2001. Therefore, even under a best-case scenario for Amtrak, *i.e.*, employing the latest delivery dates in this case, Amtrak's breach of warranty claims expired in February, 2005, well before Amtrak's September 16, 2005, Complaint.[6]

During her deposition, Forum's corporate designee and most senior officer, Ms. Garret, testified that Forum began delivering the subject luminaires in August, 1999 (Boston) and completed its last shipment by February, 2001 (New London). (*See*, deposition testimony of Paula Garret, p.55, attached hereto as **Exhibit "C"**). This testimony is further supported by her Affidavit. (*See*, Affidavit of Paula L. Garret, attached hereto as **Exhibit "E"**). Although certain replacement luminaires were shipped to Boston, only, in September or October, 2001, the initial shipments had been completed to all stations, including New London, by February, 2001. (*See*, deposition testimony of Paula Garret, pp. 55-56, attached hereto as **Exhibit "C"**).

Various invoices and correspondence exchanged by and between the parties confirm the delivery dates for the subject luminaires. For example, the Boston luminaires were delivered by August 30, 1999 (Amtrak 001770-71); the Providence luminaires were delivered in October, 1999 (Amtrak 001668; F00281-83, F00927-35); the Philadelphia luminaires were delivered prior

---

6. Again, to the extent that this Court does not recognize May 20, 1999, as the triggering date for Amtrak's breach of contract claim, this best case scenario would also apply to Amtrak's breach of contract claim.

to February, 2000 (Amtrak 002432-33, Amtrak 002316-17); the Wilmington luminaires were delivered prior to February, 2000 (Amtrak 002432-33); the Washington luminaires were delivered by March 16, 2000 (F00868-71); the Baltimore luminaires were delivered by August 16, 2000 (F00468); the New London luminaires were delivered in and around February, 2001, as they were already installed one month later (Amtrak 001355). (True and correct copies of delivery-date documentation is collectively attached hereto as **Exhibit "G"**).

Further, in response to Forum's Interrogatories Limited to the Issue of the Statute of Limitations, Amtrak feigned ignorance of the delivery dates. This is true despite Amtrak's possession of the numerous documents identified above and other detailed documents establishing installation dates for each specific station, which obviously post date Amtrak's receipt of the luminaires that are the subject matter of those installations. Amtrak responded to Forum's request for shipment date documents with a blanket objection, followed by: "Subject to, and without waiving, the general and specific objections set forth above, Amtrak states, as a general matter, it does not presently know the dates Forum shipped luminaires to Amtrak or the dates Amtrak received the luminaires from Forum." (*See*, Plaintiff's Objection and Response to Defendant and Third Party Plaintiff's Requests for Admissions and Interrogatory (Response #6), attached hereto as **Exhibit "A"**).

Amtrak's own documentation, which it has produced in response to Forum's document requests, supports Forum on the issue of delivery dates. For example, Amtrak's "HRS Platform Lighting Luminaire Review of Design, Prototype Development and Installation" report was prepared by Amtrak's Engineering Department on July 14, 2000. (*See*, "HRS Platform Lighting Luminaire Review of Design, Prototype Development and Installation" hereinafter referred to as "July 14, 2000 Amtrak Engineering Report" and attached hereto as **Exhibit "H"**). By that time,

Amtrak had already launched an investigation into various sites where the Forum-supplied luminaires had been installed.  Obviously, despite Amtrak's protestations of ignorance with respect to luminaire delivery dates, their own internal report, which also proves that the alleged deficiencies in the Amtrak luminaires were known to Amtrak by the year 2000 at the latest, establishes that luminaires were installed—and, therefore, by definition also delivered—to various Amtrak stations by July, 2000.  Applying the UCC's four year statute of limitation, Amtrak's breach of warranty claims with respect to these stations would have expired in July, 2004, over one year prior to Amtrak's initiation of this lawsuit.  Additionally, Amtrak's claims related to the Providence (October, 1999), Washington (March, 2000), Baltimore (August, 2000), and New London (February, 2001) luminaires are also barred by the UCC because the latest delivery of those luminaires occurred in February, 2001, approximately four years and seven months prior to Amtrak's filing its Complaint.

As Amtrak's breach of warranty claims are subject to a latest triggering date of February, 2001, and a four-year statute of limitation, Amtrak's breach of warranty claims are stale, barred, and, accordingly, should be dismissed.

### III.  Amtrak's Claim for Revocation of Acceptance must be similarly dismissed as untimely.

In Count I of Amtrak's First Amended Complaint, Amtrak alleges a claim for revocation of acceptance. As with Amtrak's claims for breach of contract and breach of warranty, the claim for revocation of acceptance is barred by the applicable four-year statute of limitations found in D.C.Code § 28:2-725.   Amtrak's claim for revocation of acceptance is also barred as the attempted "revocation" did not occur within a reasonable time after Amtrak knew of the grounds for revocation. Amtrak itself admits that its purported revocation of acceptance occurred by way of letter dated April 27, 2005 (*see*, Count 1, ¶ 31 of Amtrak's First Amended Complaint) after

Amtrak had made beneficial use of the light fixtures for approximately five to six years at the various Amtrak station locations by this time.[7] Evidence reveals that Amtrak knew, more than five years prior to the date of Amtrak's April 27, 2005 letter, of the alleged defects in the Forum luminaires which form the grounds for Amtrak's attempted revocation of acceptance. Therefore, Amtrak's claim for revocation of acceptance must be dismissed as a matter of law.

### A.   Amtrak's revocation of acceptance is time barred by the applicable statute of limitations for breach of contract and breach of warranty.

As set forth in full detail in preceding sections, Amtrak's claims for breach of warranty and breach of contract are barred by D.C.Code § 28:2-725. Amtrak's claim for revocation of acceptance is likewise barred by the statute of limitations set forth in that same section.

In *Snyder v. Boston Whaler*, 892 F. Supp. 955 (W.D. Mich. 1994), the Federal District Court in that case dismissed plaintiff's breach of warranty claims as being time-barred pursuant to the identical section (§2-725) of the Uniform Commercial Code. In addressing plaintiff's claims for revocation of acceptance under the code, the court dismissed this claim as well and explained, "plaintiff's revocation claim is barred as well, because plaintiff's right to revoke is based upon a finding that defendants breached a warranty." *Snyder*, 892 F.Supp. at 959.[8]

In the case presently before this Court, Amtrak's right to revoke is likewise dependant upon a finding that Forum breached a warranty. Both Amtrak's revocation of acceptance and breach of warranty claims hinge solely upon Amtrak's allegations that the Forum-supplied light

---

7.  The warranty extended by Forum for the light fixtures was for one (1) year from the date of Amtrak's acceptance of the fixtures. (*See*, "Light Fixture Design Specification for Amtrak Luminaire Development and Fabrication - Northeast Corridor" dated August 19, 1998, (Amtak 003269-78) attached hereto as **Exhibit "I"**) Amtrak's acceptance of the fixtures "was accomplished by Station Planning's Project Manager approval of Forum's invoices for delivered products." (Amtrak interoffice memorandum from Gary Eckenrode to Roy Weigand, dated May 14, 2002 (Amtrak 003937-3938) attached hereto as **Exhibit "J"**). As Amtrak had approved of, and paid, Forum invoices no later than early 2001, the warranty period for all fixtures delivered to Amtrak had long since expired prior to Amtrak's attempted revocation.

8.  Plaintiff in that case purchased a boat from defendants on or about August 17, 1984. *Snyder*, 892 F.Supp. at 957. Plaintiff filed suit on November 5, 1992, alleging breach of express warranty and revocation of acceptance, among numerous other claims. *Id*. at 957-59.

luminaires do not conform to the Design Specifications. (Compare Count I, ¶ 22 of Amtrak's First Amended Complaint, with Count IV, ¶ 47 of Amtrak's First Amended Complaint). Additionally, both the claim for revocation of acceptance and breach of warranty claims allege that Forum made certain misrepresentations and omissions that the luminaires conformed to the Design Specifications and that Amtrak relied upon said alleged misrepresentations and omissions. (Compare Count I, ¶ 23 of Amtrak's First Amended Complaint, with Count IV, ¶ 48 of Amtrak's First Amended Complaint). Amtrak's claim for revocation of acceptance relies solely on the grounds that Forum breached its warranty by supplying luminaires which were non-conforming to the Design Specifications. As such, its right to revoke is based upon a finding that Forum breached the warranty to supply conforming luminaires, which is barred by the applicable four-year statute of limitations.

This same conclusion was reached by the United States District Court for the Eastern District of Pennsylvania in *Firestone & Parson, Inc. v. Union League of Philadelphia*, 672 F.Supp. 819 (E.D. Pa. 1987).[9] In addressing the applicable statute of limitations period for plaintiffs' claim for rescission, the court noted, "[i]t is difficult to avoid the conclusion that, fundamentally, this is 'an action for breach of a contract for sale' governed by the four-year statute of limitations of 13 Pa.C.S.A. §2725 [Pennsylvania's enactment of the U.C.C.], and that the claims accrued at the time of delivery." *Firestone & Parson, Inc.*, 672 F.Supp. at 822. Similar to Amtrak in the present action, the plaintiffs in *Firestone & Parson, Inc.* sought to avoid the applicable four-year statute of limitations by "characterizing their lawsuit as a claim for

---

9. In *Firestone & Parson, Inc.*, the plaintiffs purchased from defendants a painting believed to be to work of renowned American artist, Albert Bierstadt. Plaintiff purchased the painting on August 31, 1981. *Firestone & Parson, Inc.*, 672 F.Supp. at 820. Beginning in the spring of 1985, art historians began questioning whether the painting was in fact attributable to Bierstadt, and it became generally accepted that the painting was in fact the work of Confederate artist, John Ross Key. *Id.* at 820-21. Plaintiffs filed suit on October 6, 1986 seeking rescission of the contract and damages for the difference in price. Defendants sought dismissal on the grounds that plaintiffs' claims were barred by the statute of limitations. *Id.*

rescission of the contract ....” *Id*. The court held, “this is indistinguishable from asserting that plaintiffs had a right to, and did, revoke their acceptance of the painting.” The court went on to hold that revocation of acceptance is governed by the four-year statute of limitations found in section 2-725. *Firestone & Parson, Inc.*, 672 F.Supp. at 822 (“...**whether or not the right to revoke acceptance was timely asserted, litigation predicated upon it falls within §2725.**”) (emphasis added).

In a case similarly on point, the Missouri Court of Appeals, in *Grus v. Patton*, 790 S.W.2d 936 (Mo. Ct. App. 1990), also addressed this issue.[10] The trial court dismissed the plaintiff’s claims for revocation of acceptance and breach of warranty based upon the four-year statute of limitations set forth in the same UCC Section 2-725. *Grus*, 790 S.W.2d at 938. Plaintiff appealed, contending that the four-year statute of limitations “applies only to actions for breach of a contract for sale and not to a revocation of acceptance under §400.2-608 ....” *Id*. The appellate court analyzed the relationship between revocation of acceptance under Section 2-608 and breach of contract and warranty under Section 2-725 and held that the plaintiff’s claim for revocation of acceptance was time-barred. *Id*. at 939. The court stated, “...our decisions are uniform in holding that a revocation of acceptance or recission [sic] must be made long before the expiration of four years. No decision has held that a revocation of acceptance may be made after such period.” *Id*.

Courts from other jurisdictions have also applied 2-725 to bar revocation of acceptance as untimely. In *Luddeke v. Amana Refrigeration, Inc.*, 387 S.E.2d 502 (Va. 1990),[11] the trial court

---

10. In *Grus*, plaintiff entered into a written contract for the purchase of a farm tractor from defendant on January 22, 1980. *Grus*, 790 S.W.2d at 938. On August 23, 1988, over eight years later, plaintiff filed suit alleging revocation of acceptance and breach of implied warranty of merchantability. *Id*. On August 1, 1989 plaintiff filed an amended complaint alleging revocation of acceptance, breach of implied warranty of merchantability, negligent repair and *res ipsa loquitur*. *Id*.

11. The plaintiffs brought suit against the seller and manufacturer of a home heating, air conditioning and hot water system, which was installed in plaintiff’s home in August 1982. Plaintiffs did not bring suit until five years later, on

dismissed plaintiff's breach of warranty claims as barred by the four-year statute of limitations found in the same section (§2-725) of the UCC. *Luddeke*, 387 S.E.2d at 503.  On appeal to the Virginia Supreme Court, plaintiffs argued that the trial court also dismissed their claim for revocation of acceptance *sua sponte*. *Id*. at 504. The Virginia Supreme Court denied plaintiffs appeal on the issue of revocation of acceptance, holding it too was time-barred. *Id*. at 505 ("Here, the [plaintiffs] discovered the breach of the warranty of merchantability in 1982. The breach was not cured, then or ever, and notice of rescission was not given until demanded in the bill of complaint filed in 1987. We agree with the trial court that the remedy of revocation of acceptance was time-barred.").

Amtrak's claim for revocation of acceptance is time-barred by the applicable statute of limitations set forth in Section 2-725 of the D.C. Uniform Commercial Code. The alleged breach of contract and warranty occurred no later than February 2001 when the last possible delivery of any lighting fixtures at issue in this case occurred. By its own admission, Amtrak did not attempt to revoke acceptance until April 27, 2005, after the expiration of all contractual warranties and, moreover, the expiration of the applicable statute of limitations. Therefore, as a matter of law, Amtrak's claim for revocation of acceptance is likewise time-barred.

> **B.  Amtrak's revocation of acceptance did not occur within a reasonable time and is thus barred.**

While Amtrak's claim for revocation of acceptance is governed, and thus time-barred, by the four-year statute of limitations set forth in D.C.Code § 28:2-725, Amtrak's claim in this regard is also barred by its failure to revoke acceptance within a reasonable time as required by Section 2-608 of the D.C. Uniform Commercial Code.

---

September 17, 1987, alleging breach of express and implied warranties, among other claims. *Luddeke*, 387 S.E.2d at 503.

D.C.Code §28:2-608 states in relevant part:

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

D.C. Code §28:2-608.

> **1. Amtrak knew of the grounds for revocation, at the latest, by July of 2000, thus its attempted revocation of acceptance on April 27, 2005, more than five years later, was not within a reasonable time for the revocation to be effective.**

Amtrak, knowing full well that its claims are stale, have attempted to claim that the Forum-supplied light luminaires "contain latent defects that Amtrak could not have discovered through reasonable inspection or care. These latent defects [are again alleged to] include, *inter alia*, that the light luminaires do not conform with the Design Specifications and other requirements of the Contract." (Count I, ¶ 22 of Amtrak's First Amended Complaint). Amtrak claims it discovered the alleged latent defects from an April 6, 2005 MET Laboratories report.[12] (Count I, ¶ 22 of Amtrak's First Amended Complaint). Amtrak may attempt to argue that its revocation of acceptance occurred within a reasonable time because of this April 6, 2005 MET Laboratories report. However, this argument is completely without merit, as evidence revealed during the course of discovery proves that Amtrak knew of the alleged non-conformities well before the April 6, 2005 MET Laboratories report.

---

12. The facts further indicate that, at the request of Amtrak's Office of Inspector General, Amtrak began the process of hiring MET Laboratories in early 2003 to perform testing on the luminaires, in addition to that performed by Amtrak's own Engineering Department in 2000. (*See*, Amtrak's OIG Review of Forum Platform Lights, dated March 9, 2003 (Amtrak 004454-72) attached hereto as **Exhibit "F"**);(Amtrak Office of Audits Memorandum, dated September 19, 2003, (Amtrak 004062-63) attached hereto as **Exhibit "K"**).

### a. Amtrak knew of the grounds for revocation no later than July 14, 2000.

Documents produced by Amtrak reveal that Amtrak's engineering department knew of the alleged non-conformity of the Forum-supplied luminaires <u>no later than July 14, 2000</u>, when it finalized a formal report on the topic of the fixture's alleged non-conformities entitled, "HRS Platform Lighting Luminaire Review of Design, Prototype Development and Installation" (herein referred to as "July 14, 2000 Amtrak Engineering Report" and attached hereto as **Exhibit "H")**. This report, prepared by Amtrak's Senior Electrical Engineer - Structures group, details Amtrak's investigations into the various sites where the Forum-supplied luminaires had been installed, including Amtrak stations at Rt. 128-Boston, 30th Street Station-Philadelphia and Wilmington, Delaware.  The observations reported during the investigations expressly include, for example: excessive thermal ratcheting of the luminaires; luminaire lenses bowing, causing loss of luminaire seal and ingress of contaminants including water and ice; lens retention clamps "popped into the open position"; luminaire straps broken apart; luminaire endplate knockouts without protective bushings; and wire connectors falling off, among other observations. (*See*, July 14, 2000 Amtrak Engineering Report, Section 4.0 "<u>SITE INVESTIGATIONS</u>" attached hereto as **Exhibit "H"**).

The "<u>FINDINGS</u>" section of the July 14, 2000 Amtrak Engineering Report goes on to detail how Amtrak's engineering department believed the luminaires specifically failed to conform to the Design Specifications.  (*See*, July 14, 2000 Amtrak Engineering Report, Section 5.1 "<u>DEVIATIONS FROM SPECIFICATION</u>" attached hereto as **Exhibit "H"**). Amtrak's engineering department identified sections of the Design Specifications which they felt the

luminaires did not comply with. The Design Specifications[13] identified in the July 14, 2000 Amtrak Engineering Report include:

> Section 5.1 – "Materials, equipment and appurtenances as well as workmanship provided under this Section shall conform to the highest commercial standard as specified and as indicated on the drawings."

> Section 7.3 – "Luminaire shall be suitable for cleaning with high pressure water jets."

> Section 7.4 – "Luminaire shall be UL listed for use in a wet location."

> Section 8.5 – "All lenses or other light diffusing elements shall be removable, but positively held so that hinging thermal expansion, platform vibration or other normal motion will not cause them to drop out."

The July 14, 2000 Amtrak Engineering Report went on to conclude that "[t]his product is showing signs of poor quality and failure to operate as designed in all locations surveyed."[14]

Amtrak's engineering department was charged with testing and identifying non-compliance of the luminaires with the Design Specifications. As stated by Amtrak's Senior Director of Procurement,

> Ultimately, **the acceptability, testing and quality compliance of work performed as per the technical specifications are engineering functions within Amtrak** .... It is Amtrak Engineering's role to accept or reject the work as it progresses, match schedule to the contract period of performance, approve payments, prepare punch list items, **identifying any items or issues that are non-compliant with contracted technical specifications** and authorize conditional and final project acceptance.

(Amtrak Interoffice Memorandum from Gary Eckenrode to Roy Wiegand, Senior Director - Audits, dated April 10, 2002 (Amtrak 003931-33) attached hereto as **Exhibit "M"**). As clearly evidenced by the July 14, 2000 report prepared by Amtrak's engineering department, Amtrak

---

13. The design specifications applicable to the fixtures are attached for the Court's review. (*See*, "Light Fixture Design Specification for Amtrak Luminaire Development and Fabrication - Northeast Corridor" dated August 19, 1998, (Amtak 003269-78) attached hereto as **Exhibit "I"**).

14. (*See also*, Interoffice Memorandum from Roy Wiegand, Amtrak Senior Director of Audits, dated April 24, 2002 (Amtrak 003934-36) attached hereto as **Exhibit "L"**). This document describes the July 14, 2000 Amtrak Engineering Report as follows: "This report highlights where the Forum light [luminaires] deviated from the light specification[s] and provides evidence of Forum's use of deficient materials and workmanship."

knew of the grounds for revocation of acceptance of the luminaires no later than July 14, 2000.[15]

Amtrak's April 27, 2005 letter attempting to revoke acceptance more than five years after

discovering the grounds for revocation is certainly not within a reasonable time.

> **b. Amtrak cannot rely upon the 2005 MET Report as the basis for its knowledge of the grounds of revocation, as the MET Report simply confirms the problems previously identified by Amtrak engineering in the year 2000.**

Any reliance by Amtrak on the April 6, 2005 MET Report as the first time it learned of

the grounds for revocation is wholly unsupportable. A review of the 2005 MET Report evidences

that it is merely a reiteration of the same problems with the luminaires that Amtrak's own

engineering department identified nearly five years previously in the July 14, 2000 Amtrak

Engineering Report and which are the same problems which are alleged to form the basis of

Plaintiff's Amended Complaint in this case.

The "Findings" section of the 2005 MET Report, (*See*, Environmental Simulation Report

of Equipment Compliance for the Lighting Fixtures, Section V "Findings" (Amtrak 3199-3200)

attached hereto as **Exhibit "P"**), outlines the problems with the luminaires identified by MET

Laboratories and  parallels Section 5.0 "Findings" from the  July 14, 2000 Amtrak Engineering

Report as follows:

COMPARE:

- **2005 MET Report** - Fade Test - "the top lens had bowed ½ inch out from the aluminum body of the light luminaire and it had twisted along its longest axis." A bowed lens would allow insects to enter the lens, to collect inside and decrease light output.

---

15. Amtrak's Manager-Stations Program, Mary Montgomery testified as follows: that a study had been commissioned prior to the July 14, 2000 Amtrak Engineering Report; that the July 14, 2000 Amtrak Engineering Report was the final report of this study; that a draft of the report was made prior to July 14, 2000 (February 16, 2000 draft of the "HRS Platform Lighting Luminaire Review of Design, Prototype Development and Installation", (Amtrak 0002319-54) attached hereto as **Exhibit "N"**); and that she was aware of the very problems identified in the July 14, 2000 Amtrak Engineering Report during the summer of 2000. (*See*, deposition testimony of Mary Montgomery, pp. 88-94 attached hereto as **Exhibit "O"**).

and

- **2005 MET Repor**t - Thermal Cycling - "the top and bottom center lenses on a 12ft luminaire bowed outward. The clamps on either end had shifted and were on the verge of falling off the bottom lens.

  **with**:

- **July 14, 2000 Amtrak Engineering Report** - "Bowing condition and subsequent loss of lens seal is allowing contaminants to enter the luminaire (water and ice observed in exterior locations).

COMPARE:

- **2005 MET Report** - Hosedown - "A significant amount of water entered along each seam and joint. The foam gasket was not able to deny water entry."

  **with**:

- **July 14, 2000 Amtrak Engineering Report** - "Bowing of luminaire lens is causing loss of sealing at lens gaskets." Citing specification requirement that "Luminaire shall be suitable for cleaning with high pressure water jets."

COMPARE:

- **2005 MET Report** - Structural Luminaire Installment Analysis - "The luminaire should use stainless steel straps so the straps won't corrode."

  **with**:

- **July 14, 2000 Amtrak Engineering Report** - "Luminaire strap construction utilizes spot welded hinges that are breaking apart at outdoor locations which is causing loss of sealing and lens retention systems." As well as, "Lens clips are not staying in closed position. When the lens clips opens, the gasketing is compromised and the inside of the luminaire is no longer protected from exterior contaminants."

As evidenced above, the 2005 MET Report, which Amtrak claims reveals "latent defects" with the luminaires which allegedly were not known to Amtrak prior, does nothing more than confirm and re-categorize the same problems which Amtrak knew about, and formally reported on, five years earlier. The specific problems with bowing lenses, loss of seal, water and

21

contaminant ingress, and faulty clips and lens straps which are identified as problems in the 2005 MET Report are the very same problems, with the very same lighting fixtures, identified in the July 14, 2000 Amtrak Engineering Report. That the 2005 MET Report attempts to re-characterize those same problems with the luminaires by pointing to other sections of the Design Specifications does nothing to change the simple fact that Amtrak identified these very problems in 2000. Thus Amtrak knew of the grounds for revocation but did not attempt to revoke within a reasonable time. Amtrak's asking MET Laboratories to confirm the same problems five years later does not make effective Amtrak's attempt to revoke in 2005.

> **c. Relevant case law on point leads to but one conclusion: Amtrak did not revoke acceptance within a reasonable time after discovery of the grounds for revocation in 2000.**

In *Salt Lake City Corp. v. Kasler Corp.*, 855 F.Supp. 1560 (D. Utah 1994), the court addressed the issue of timeliness of revocation under Utah's enactment of Section 2-608 of the Uniform Commercial Code.[16] In addressing the issue of revocation of acceptance, the court held that acceptance of the aggregate material "was not induced by a difficulty of discovery. To the contrary, Kasler was provided a reasonable opportunity to inspect the aggregate. Under these circumstances, Kasler should have discovered and timely rejected the out-of-specification materials before they were substantially changed." *Salt Lake City Corp.*, 855 F.Supp. at 1666. Thus the court held that Kasler could not revoke its acceptance. *Id.*

---

16. Salt Lake City Corp. hired Kasler as general contractor to construct an apron and connecting taxiway at Salt Lake International Airport. Kasler entered into purchase agreements with Monroc, Inc. for the supply of aggregate for use in the concrete. *Salt Lake City Corp.*, 855 F.Supp. at 1563. The aggregate was supplied no later than December of 1984. *Id.* After completion of the project, the concrete surface began deteriorating and Salt Lake City Corp. filed suit against Kasler on June 14, 1990. Kasler, in turn, filed a third-party action against Monroc claiming that the aggregate did not meet the specifications of the contract. *Id.* at 1563-64. Similar to the assertions made by Amtrak in the present litigation, Kasler claimed that it "unknowingly incorporated this defective aggregate into the concrete which comprised the apron and taxiway and that it was unaware that Monroc supplied out-of-specification materials until sometime in 1991." *Id.* at 1565. Despite Kasler's claims, "Kasler representatives occasionally visited the Monroc site and obtained samples for testing. Even though Kasler did not test the material on site, it knew that the material was being tested at Chen & Associates laboratory. …. [I]t seems clear that Kalser could have initiated inquiries to learn about the results of tests performed on the materials supplied by Monroc." *Id.*

In this case, not only did Amtrak have a reasonable opportunity to inspect the Forum-supplied luminaires, Amtrak's engineering department actually *did* inspect the luminaires and found them to be out-of-specification, to the extent being alleged to form a basis for this case, as evidenced in the July 14, 2000 Amtrak Engineering Report. The time from which to measure the timeliness of Amtrak's revocation of acceptance began prior to, and no later than, July 14, 2000 and its attempt to revoke acceptance <u>after more than five years</u> is not, under any rationale, "reasonable".

This issue was also addressed in *Knapp Shoes, Inc. v. Sylvania Shoe Manufacturing Corp.*, 72 F.3d 190 (1st Cir. 1995), *cert. denied*, 517 U.S. 1245 (1996). On appeal, the plaintiff in *Knapp Shoes*, sought revocation of acceptance of its entire inventory of shoes bought from defendant over a period of years. *See*, *Knapp Shoes, Inc.*, 72 F.3d at 200. The First Circuit held that revocation of acceptance was not an available remedy because it was not made in a reasonable amount of time. Plaintiff argued that the adhesion/bond problems associated with the shoes bought from defendant were "latent defects" because they could not be discovered through reasonable inspection or care and that it relied upon seller's assurances that it had corrected the problems. *Id*. at 201. The First Circuit noted that "[t]he difficulty with ... [plaintiff's] position is that by mid-1988 it had ample knowledge that customers were complaining about separation [of the shoe material], and its own experience confirmed that ... [defendant] was not successfully solving the underlying problems." *Id*. The Court further noted that the plaintiff itself performed inspections and tests on the shoes in 1988 and discovered the defects, yet did not attempt to revoke acceptance of the shoes until sometime in 1990, nearly two years later. *Id.* The First Circuit held that plaintiff's attempted revocation of acceptance was not effective because it did not come within a reasonable time after the plaintiff discovered the grounds for revocation. *Id*.

("Nothing ... suggests that a buyer can accept deliveries of a vast number of items over a period of a year and a half and then suddenly revoke the acceptance of all of them based on defects whose presence was known or suspected during the entire period.")

This conclusion is further supported by the decision of the United States District Court for the Northern District of Illinois in *MacSteel International USA Corp. v. Superior Products Co., Inc.*, 2002 WL 472288 (N.D. Ill. 2002).[17] In addressing the issue of revocation of acceptance, the court held that "[n]either the July 14, 1998 nor the September 1, 1998 letters by Superior to MacSteel was a timely revocation of Superior's acceptance of the wire rod because Superior did not give notice to MacSteel of any non-conformity within a reasonable time. Revocation must occur within a reasonable time after the buyer discovers or should have discovered the ground for it." *MacSteel International USA Corp.*, 2002 WL 472288 at *6 (citing 810 Ill. Comp. Stat. 5/2-608(2)). Notably similar to the present action, "Superior performed its own tensile strength tests on the rod in late March 1998 and obtained results consistent with the mill test certificates. Thus, Superior was well aware of the tensile strength of the goods and, thus, in possession of the 'grounds' for any purported revocation based upon insufficient tensile strength long before September 1998." *Id*. Based upon Superior's testing and discovery of the grounds for revocation, the court in *MacSteel* held, "Superior, therefore, cannot meet the 'reasonable time' element required for an effective revocation." *Id*.

---

17.  MacSteel initiated litigation against Superior for breach of contract for wire rod supplied to Superior. *MacSteel International USA Corp.*, 2002 WL 472288 at *1. Superior filed a counterclaim "alleging that the wire rod sold by MacSteel did not conform to the requirements of the contract and that Superior did not accept, or revoked its acceptance of delivery of, the wire rod." *Id*. In the fall of 1997, the parties began negotiations for the supply of wire rod by MacSteel to Superior, and Superior issued purchase orders to MacSteel in October and November of 1997. *Id*. at *2. In January of 1998, MacSteel provided Superior with mill test certificates, indicating, among other specifications, the tensile strength of the wire rod. In addition to these tests, Superior performed its own tensile strength tests on the wire rod. *Id*. at *3. MacSteel delivered the requested wire rod on February, 13, 1998. On July 14, 1998, Superior notified MacSteel via letter that the wire rod delivered did not meet the contract specifications. *Id*. at *4. Superior delivered a subsequent letter on September 1, 1998, attempting to revoke acceptance.

In *MacSteel*, the time between Superior's discovery of the grounds for revocation based upon its own testing of the tensile strength, and Superior's attempted revocation of acceptance, was approximately five months. The court held this to be an unreasonable span of time under Section 2-608. In the matter presently before this Court, the time between the July 14, 2000 Amtrak Engineering Report, detailing the inspection and findings of noncompliance of the luminaires, and Amtrak's attempted revocation of acceptance, was almost five years. Clearly, this span of time is unreasonable under Section 2-608 as well. Other case law from various jurisdictions supports this result. *See*, *Sobiech v. Int'l Staple and Machine Co., Inc.*, 867 F.2d 778, 781 (2d Cir. 1989)(Buyer's attempted revocation of acceptance of onion packaging equipment was not within a reasonable time, as buyer tested equipment for four months prior to purchase and attempted revocation three years subsequent to purchase.); *Euroworld of California, Inc. v. Blakey*, 613 F.Supp 129, 134 (S.D.FL. 1985) (Failure by buyer to notify seller of problems with engines until nine months after delivery not timely and therefore not effective revocation under §2-608.); *Import Traders, Inc. v. Frederick Mfg. Corp.*, 457 N.Y.S.2d 742, 743-44 (N.Y. Civ. Ct. 1983)(Five months constitutes unreasonably long time for revocation of acceptance of rubber pads.); *ITT-Industrial Credit Co. v. Milo Concrete Co., Inc. v. J.I. Case Co.*, 229 S.E.2d 814, 822 (N.C. Ct. App. 1976)(Buyer not entitled to revoke acceptance of concrete pump after five months' operation, since §2-608 requires revocation of acceptance to occur within a reasonable time of acceptance.).

Amtrak attempted to revoke acceptance of the Forum-supplied luminaires on April 27, 2005. The four-year statute of limitations applicable to Amtrak's breach of contract and breach of warranty claims controls, and therefore time-bars Amtrak's revocation of acceptance claim. Amtrak's April 27, 2005 letter was not an effective revocation of acceptance because it was not

25

provided within a reasonable time. Amtrak's engineering department inspected the luminaires and found them to be non-compliant with the Design Specifications. As evidenced by the July 14, 2000 Amtrak Engineering Report, Amtrak discovered the grounds for revocation no later than the date of this formal report. Amtrak's attempted revocation of acceptance by letter dated April 27, 2005 came at least five years after Amtrak's discovery of the grounds for revocation. Therefore, Amtrak cannot meet the "reasonable time" element required for an effective revocation of acceptance.

Dated: <u>February 12, 2007</u>          Respectfully submitted,

By:   <u>/s/ Steven W. Zoffer</u>
            Steven W. Zoffer, Esquire
            D.C. Bar #435772
            Douglas M. Grimsley, Esquire
            D.C. I.D. #PA0019
            Dickie, McCamey & Chilcote, P.C.
            Two PPG Place, Suite 400
            Pittsburgh, PA  15222
            (412) 281-7272 (Telephone)
            (412) 392-5397 (Facsimile)
            szoffer@dmclaw.com
            dgrimsley@dmclaw.com

            *Counsel for Defendant/Third-Party Plaintiff, Forum, Inc.*

## CERTIFICATE OF SERVICE

I, Douglas M. Grimsley, Esquire, hereby certify that a true and correct copy of the foregoing Statement of Points and Authorities has been served this 12th day of February, 2006, electronically and via U.S. first class mail, postage prepaid, to the following counsel of record:

Stephen M. Ryan, Esquire
Stephen L. Neal, Jr., Esquire
Manatt, Phelps & Phillips, LLP
700 12th Street, N.W., Suite 1100
Washington, DC  20005
*Counsel for Plaintiff*

Joseph Brooks, Esquire
Wade B. Wilson, Esquire
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
*Counsel for Advance Transformer, Co.*

Russell J. Ober, Jr., Esquire
Patricia L. Dodge, Esquire
Meyer, Unkovic & Scott LLP
1300 Oliver Building
Pittsburgh, PA  15222-2304
*Counsel for Southco, Inc.*

_____/s/ Douglas M. Grimsley____
Douglas M. Grimsley, Esquire